IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| BALBOA CAPITAL CORPORATION, | |
|---|---|
| v. | |
| OKOJI HOME VISITS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0898-M **LEAD CASE** |
| SHAFIE TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0900-M |
| BUTT TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0901-M |
| PATEL TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0902-M |
| THI TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0904-M |
| WOLDEGIORGIS TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0907-M |
| SIDDIQUI TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0908-M |
| ORTEGA HOME VISITS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0909-M |
| LAS VEGAS TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0910-M |
| EL-SALIBI TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0916-M |
| POKU HOME VISITS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0917-M |
| OPAIGBEOGU MHT LLC, ET AL. | Civil Action No. 3:18-cv-0918-M |
| SOZI TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-0919-M |
| IMRAN TRANSITIONS MHT, LLC, ET AL. | Civil Action No. 3:18-cv-0921-M |
| WAHAB TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-1949-M |
| SAGHIR TRANSITIONS MHT LLC, ET AL. | Civil Action No. 3:18-cv-1950-M |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the Motions for Summary Judgment, filed in the consolidated cases referenced above. *See Balboa Capital Corp. v. Okoji Home Visits MHT LLC, et al.* ("Lead Case"), No. 3:18-cv-0898-M, ECF No. 415; *Balboa Capital Corp. v. Shafie Transitions MHT LLC, et al.*, No. 3:18-cv-0900-M, ECF No. 75; *Balboa Capital Corp. v. Butt Transitions MHT LLC, et al.*, No. 3:18-cv-0901-M, ECF No. 73; *Balboa Capital Corp. v. Patel Transitions MHT LLC, et al.*, No. 3:18-cv-0902-M, ECF No. 75; *Balboa Capital Corp. v. Thi Transitions MHT*

1

*LLC, et al.*, No. 3:18-cv-0904-M, ECF No. 73; *Balboa Capital Corp. v. Woldegiorgis Transitions MHT LLC, et al.*, No. 3:18-cv-0907-M, ECF No. 73; *Balboa Capital Corp. v. Siddiqui Transitions MHT LLC, et al.*, No. 3:18-cv-0908-M, ECF No. 74; *Balboa Capital Corp. v. Ortega Home Visits MHT LLC, et al.*, No. 3:18-cv-0909-M, ECF No. 70; *Balboa Capital Corp. v. Las Vegas Transitions MHT LLC, et al.*, No. 3:18-cv-0910-M, ECF No. 76; *Balboa Capital Corp. v. El-Salibi Transitions MHT LLC, et al.*, No. 3:18-cv-0916-M, ECF No. 74; *Balboa Capital Corp. v. Poku Home Visits MHT LLC, et al.*, No. 3:18-cv-0917-M, ECF No. 74; *Balboa Capital Corp. v. Opaigbeogu MHT LLC, et al.*, No. 3:18-cv-0918-M, ECF No. 73; *Balboa Capital Corp. v. Sozi Transitions MHT LLC, et al.*, No. 3:18-cv-0919-M, ECF No. 70; *Balboa Capital Corp. v. Imran Transitions MHT, LLC, et al.*, No. 3:18-cv-0921-M, ECF No. 60; *Balboa Capital Corp. v. Wahab Transitions MHT LLC, et al.*, No. 3:18-cv-1949-M, ECF No. 61; *Balboa Capital Corp. v. Saghir Transitions MHT LLC, et al.*, No. 3:18-cv-1950-M, ECF No. 58.[1] On March 9, 2022, the Court heard argument on the Motions. For the following reasons, the Motions are **GRANTED**.

## I. BACKGROUND

### a. Factual and Procedural Background

These consolidated cases arise out of America's Medical Home Team, Inc.'s ("MHT") operation of the Medical Home Team Services Program ("MHT Program"), through which physicians could remotely supervise nurse practitioners making house calls in the physicians' region. As part of a physician's participation in the MHT Program, MHT required that a limited

---

[1] The Court consolidated for pretrial purposes Balboa's separate suits against various physicians. Lead Case, ECF No. 43. The Court's order consolidating the cases directed the parties to make all pretrial filings in both the lead case and in the individual case to which the matter relates. This Order therefore also addresses Defendants' Motions for Summary Judgment filed in the Lead Case. *See* Lead Case, ECF Nos. 346, 348, 350, 352, 354, 418, 421, 425, 428, 431, 434, 437, 440, 443, 446.

liability company (the "Physician LLC") be created to handle the MHT Program's financing, which purportedly would be used to pay for licenses, software, and other operational costs. The Physician LLC would then obtain financing from a lender to fund the purchase of one or more licenses from MHT, each corresponding to one nurse practitioner, with the individual physician and the physician's professional corporation, to the extent one existed, serving as guarantors.

In October 2016, Plaintiff Balboa Capital Corporation ("Balboa") became a lender for MHT, after being referred by a previous lender, Defendant Ascentium Capital, LLC ("Ascentium"). MHT employees recruited physicians directly. The physicians involved in these cases generally represent that they received some version of the following representations from MHT regarding the arrangement: (1) Balboa, working with MHT, would provide the financing for the Physician LLC to purchase the licenses; (2) the doctors would not have to repay the loans themselves because the loans would be paid by revenue generated from patient billing, and if not sufficient, MHT would make payments to Balboa through "deficit funding"; and (3) if the physician wanted to leave the MHT program, MHT would resell the license.

MHT forwarded completed credit applications, co-branded with both Balboa's and MHT's logos, to Balboa for processing. The amount of financing depended on the number of MHT licenses to be purchased, but MHT's CEO, Scott Postle, stated during his deposition that MHT, and not the physician, determined the number of licenses to be financed. Lead Case, ECF No. 455, at BALBOA APP_1932–33.

After approving the physician's credit application, Balboa generated the loan documents and sent them to MHT for MHT to obtain the necessary signatures from the physicians. The loan documents included an MHT Installment Payment Agreement ("IPA") or Monthly Payment Agreement ("MPA"), to be executed by the Physician LLC, and a guaranty agreement, to be

executed by the physician and, if applicable, the physician's professional corporation.  When MHT met with physicians to execute the funding documents, MHT would take a photo of the physician's drivers license, and occasionally a photo of the physician, with an iPad box as a form of verification for Balboa that the physician had received equipment covered by the MHT program.  However, MHT's CEO testified that none of the doctors financed by Balboa ever received any iPads, cars, or other equipment from MHT.  *Id.* at BALBOA APP_1961–63.  In addition, it is undisputed that MHT never executed a license agreement with any defendant physician, and no nurse practitioners were ever hired pursuant to the MHT Program.

The MPA and IPA agreements are form documents drafted by Balboa, and contain similar terms, including a California choice of law provision.  Each executed MPA or IPA identifies Balboa as the "Creditor," and the respective Physician LLC as "Debtor."  *E.g.*, Lead Case, ECF No. 266-1 at 1–2 ("MPA"); *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61-2 at 418 (IPA executed in *El Salibi Transitions*, Case No. 3:18-cv-916) ("IPA").  MHT is not referenced within the text of the MPA or IPA; however, the MPA and IPA each reference a license agreement between the Debtor and a "Supplier" or "vendor," who is providing Debtor with the product or software being licensed.[2]  The MPA and IPA each state that, rather than Debtor paying the supplier directly, the Creditor will provide financing to the supplier, and Debtor will repay Creditor pursuant to the terms described in the MPA or IPA.[3]  Each executed

---

[2] Specifically, the MPA states it "contains the terms of Debtor's agreement with Creditor.  Debtor acknowledges that it has decided to enter into this Agreement in lieu of paying cash to the Supplier of the Product.  Creditor agrees to finance for Debtor and Debtor agrees to pay Creditor for the Product identified above."  MPA at 1.  Although the words "Product" and "Supplier" are capitalized throughout the MPA, neither term is defined.  The IPA states "Debtor and its vendor(s) have entered into an agreement ('License' and with any related documents 'Software Documents') for the licensing of certain software to Debtor . . . and/or the provision of certain services by vendor(s) to Debtor as specified in the License. Pursuant to the Software Documents, Debtor is obligated to pay vendor(s) the full amount of the fee needed to license the Software and pay for related services ('Fee')."  IPA at 1.

[3] The MPA states that "Debtor acknowledges that it has decided to enter into this Agreement in lieu of paying cash to the Supplier of the Product," and that "Creditor agrees to finance for Debtor and Debtor agrees to pay Creditor for the

4

MPA and IPA contains a "Payment Schedule," reciting the total number of monthly payments Debtor will pay Creditor, and the amount of each payment. For example, the MPA in the Lead Case, *Okoji*, recites that the debtor Physician LLC shall pay "6 Monthly Payments @ $396.00" and "60 Monthly Payments @ $7,596.00," for a total term of 66 months. MPA at 1. Similarly, in *El Salibi Transitions*, the IPA recites the following: "PAYMENT SCHEDULE: 1-6 @ $396.00, 7-66 @ $7,596.00." IPA at 1.

The executed MPA and the IPA do not state the number of licenses being financed, the cost per license, or otherwise identify the software or equipment that is the subject of the respective MPA or IPA. For the portion of the form titled "Equipment Supplier and Description," the executed MPA and IPAs each incorporate by reference "Exhibit 'A1' Invoices, or Schedules." However, none of the executed MPAs and IPAs have attachments, let alone any attachment identified as "Exhibit A1"; moreover, there is no document in the record marked "Exhibit A1," and there is no evidence that any document marked Exhibit A1 was ever provided to the physicians, either before or after each respective MPA or IPA was executed.[4] Balboa's CEO, Patrick Byrne, agreed during his deposition that, without Exhibit A1 or any of the invoices purportedly part of Exhibit A1, it would not be possible to identify the equipment or services covered by the agreement from the face of the MPA or IPA, or an associated cost. *See* Lead Case, ECF No. 417, at APP0017–25.

---

Product identified above." MPA at 1. The IPA states that, pursuant to software license agreement between Debtor and "its vendor(s)," Creditor and Debtor agreed that "Creditor shall instead make such payments of the Fee on behalf of Debtor to vendor(s) under the Software Documents, and Debtor hereby agrees to make installment payments (each a "Payment") and discharge its other obligations set forth herein." IPA at 1.

[4] Balboa argues in its responsive briefing that Exhibit A1 consists of MHT invoices, which reflect the number of licenses financed for each Physician LLC and an associated price per license. *E.g.*, Lead Case, ECF No. 496 at 20. However, Balboa's counsel conceded at the hearing that the only evidence Balboa has in support of its position are the declarations of its employees, Patrick Byrne and Robert Rasmussen, which the Court has already struck. *See* Lead Case, ECF No. 699. As a result, there is nothing in the summary judgment record identified as Exhibit A1.

5

In addition, although the MPA and IPA contain a payment schedule describing how Debtor shall repay the loan, neither document states a total loan amount owed by Debtor to Creditor, an interest rate for the loan,[5] or the total amount to be paid by the Creditor to the supplier or vendor (*i.e.*, the amount paid by Balboa to MHT on behalf of the Debtor). Moreover, neither document expressly contemplates that Creditor is permitted to make a lump sum payment for the full term—as opposed to installment payments—to the supplier or vendor; instead, both the MPA and IPA contemplate that Creditor will make multiple payments on behalf of Debtor.[6]

Balboa executed its first MPA or IPA agreement with a Physician LLC on October 18, 2016, and its last on February 27, 2017.[7] *See Woldegiorgis*, No. 3:18-cv-00907, ECF No. 61-1; *Balboa Capital Corp. v. Samuel Transitions MHT LLC*, Case No. 3:18-cv-2646, ECF No. 39-1. After Balboa received the executed loan documents, but prior to funding, a verbal verification

---

[5] The only interest rate described in the MPA concerns interest to be charged for late monthly payments or interest to be charged in the event of default, but does not describe the total interest to be charged over the life of the loan. *E.g.*, MPA ¶ 21 ("LATE PAYMENT. If Debtor fails to pay any amount to be paid hereunder with Three (3) days of when due, Debtor agrees to pay us (a) eighteen percent (18%) of each such late payment (to the extent permitted by law) . . . (c) interest on such unpaid amount from the date due until paid at the lesser of eighteen percent (18%) per annum or the highest rate permitted by applicable law. No more than a single charge under subparagraph (a) will be due in any given month."). Similarly, the IPA references a late "charge" of "10% of such amount or $25.00" if payments are not received when due, and states that "[a]ll amounts not paid when due shall accrue at 1.5% per month." IPA at 1.

[6] Instead, both documents contemplate that Creditor will make multiple payments on behalf of Debtor. For instance, the MPA distinguishes between "Monthly Payments," referring to Debtor's obligations to Creditor, and "monthly payments," referring to Creditor's payments to the Supplier. *Compare, e.g.*, MPA ¶ 2 ("Debtor shall repay Creditor the above Monthly Payments in the amounts indicated above. The initial Monthly Payment shall be deemed due as of the date indicated above and subsequent Monthly Payments shall be due on the same day of each month hereafter until paid."), *with id.* ¶ 3 ("You request and authorize us to pay to Supplier the *amounts* listed in this Agreement and attached Schedules notwithstanding that some or all of the Products have yet to be delivered or performed. . . . You request that we pay Supplier and you acknowledge that *monthly payments will commence*." (emphasis added)). Similarly, the IPA distinguishes between "Payments" from Debtor to Creditor, and "payments" to the vendor; it states that "Creditor and Debtor have agreed that instead of Debtor making payments of the Fee to vendor(s), Creditor shall instead make such *payments* of the Fee on behalf of Debtor to vendor(s) under the Software Documents, and Debtor hereby agrees to make installment payments (each a '*Payment*')." IPA at 1 (emphasis added).

[7] As relevant to this opinion, the following cases involve MPA agreements: Lead Case, Case No. 3:18-cv-898; *Shafie Transitions*, Case No. 3:18-cv-900; *Butt Transitions*, Case No. 3:18-cv-901; *Patel Transitions*, 3:18-cv-902; *Thi Transitions*, Case No. 3:18-cv-904; *Woldegiorgis Transitions*, Case No. 3:18-cv-907; *Ortega Home Visits*, Case No. 3:18-cv-909; *Sozi Transitions*, Case No. 3:18-cv-919; *Las Vegas Transitions*, Case No. 3:18-cv-910; and *Wahab Transitions*, Case No. 3:18-cv-1949. The following cases involve IPA agreements: *Poku Home Visits*, Case No. 3:18-cv-917; *Opaigbeogu*, Case No. 3:18-cv-918; *Imran Transitions*, Case No. 3:18-cv-921; *Siddiqui Transitions*, Case No. 3:18-cv-908; *El-Salibi Transitions*, Case No. 3:18-cv-916; *Saghir Transitions*, Case No. 3:18-cv-1950.

call with the physician was allegedly performed by Janet Jonas, Account Coordinator at Balboa. Jonas testified in her deposition that she did not follow a script when making the verbal verification calls, but she generally followed prompts in a form she completed to memorialize the call.  Lead Case, ECF No. 455, at BALBOA APP_2354.  The verification calls were not recorded, and Jonas testified that she does not specifically recall speaking with any particular physician or whether she asked each question on the form to each physician she spoke to.  *Id.* at BALBOA APP_2331, _2369.  Jonas only generally recalled having to verify customer billing information, address, payment terms, and authorization to commence the transaction, and she was never required to discuss the total amount borrowed by each doctor during the verification process, or confirm that the physician had entered into a license agreement with MHT.  *Id.* at BALBOA APP_2340–41, _2347, _2352, _2367.  With the exception of the verbal verification call prior to funding, the physicians had no direct contact with Balboa.

After receiving the executed loan documents and completing the verbal verification calls, Balboa funded each loan by sending the full loan amount to MHT.  Prior to funding, Balboa never received or confirmed the existence of any executed license or software agreement, as referenced in the MPA and IPAs.

For each of the loans, MHT made the initial repayments to Balboa when due.  In April 2017, MHT announced it was terminating all license agreements, and ceased making monthly payments to Balboa.  In May 2017, MHT declared bankruptcy.  The first Physician LLCs defaulted on their loan obligations to Balboa on or about April 18, 2017.  *Samuel Transitions*, No. 3:18-cv-2646, ECF No. 61 ¶ 37.  By June 2017, all the Physician LLCs had defaulted on their loan obligations to Balboa, and Balboa initiated collection suits against each of them, naming as defendants in each respective suit the Physician LLC and the physician as guarantor.

7

The first sixteen cases were filed in California state court in May of 2017, before being removed to the Central District of California and subsequently transferred to this Court in April 2018. The last four cases were filed in this Court. On January 24, 2019, this Court consolidated these cases for pretrial management. ECF No. 43.

This memorandum opinion and order concerns sixteen of the consolidated cases, which fall into two groups based on defense counsel. In eleven of the cases, the physician guarantors are represented by Hall Griffin LLP (referred to here as the "Hall Griffin Defendants").[8] In their respective cases, the Hall Griffin Defendants each assert counterclaims on behalf of the guarantors, namely three claims for recission of guaranty based on fraud (pursuant to Cal. Civ. Code § 1689(b)(1)), failure of consideration (Cal. Civ. Code § 1689(b)(2)–(4)), and as being contrary to the public interest (Cal. Civ. Code § 1689(b)(6)); a claim for declaration of unenforceability of contracts, seeking a declaratory judgment that the MPAs and personal guarantees are invalid and unenforceable; and a claim for declaration of unconscionability, seeking a declaration that the MPAs and personal guarantees are enforceable as unconscionable. *See, e.g.*, Lead Case, ECF No. 171 at 18–23.[9] In the remaining five cases relevant to this opinion, the Physician LLCs and guarantors are represented by Ferguson Braswell Fraser &

---

[8] *See* Lead Case, Case No. 3:18-cv-898; *Shafie Transitions*, Case No. 3:18-cv-900; *Butt Transitions*, Case No. 3:18-cv-901; *Patel Transitions*, Case No. 3:18-cv-902; *Thi Transitions*, Case No. 3:18-cv-904; *Woldegiorgis Transitions*, Case No. 3:18-cv-907; *Ortega Home Visits*, Case No. 3:18-cv-909; *Poku Home Visits*, Case No. 3:18-cv-917; *Opaigbeogu*, Case No. 3:18-cv-918; *Sozi Transitions*, Case No. 3:18-cv-919; *Imran Transitions*, Case No. 3:18-cv-921. The Hall Griffin Defendants designated the filings in Lead Case, *Okoji*, Case No. 3:18-cv-898, as representative of the motions, briefs, and appendices filed on behalf of all the Hall Griffin Defendants. *See* Lead Case, ECF No. 695.

[9] Using the Lead Case as an example, the non-Physician LLC defendants in the Lead Case filed their First Amended Answer to the First Amended Complaint and First Amended Counterclaims on November 8, 2019. *See* Lead Case, ECF No. 171. On December 6, 2019, the same defendants filed their Answer to Balboa's Second Amended Complaint, and specifically stated that "[t]his answer does not amend or modify the First Amended Counterclaim of Defendants filed on November 8, 2019." Lead Case, ECF No. 211. On September 18, 2020, after Balboa filed the Third Amended Complaint, the parties entered a stipulation providing that defendants' answer to the Second Amended Complaint would be deemed responsive to the Third Amended Complaint. ECF No. 283. Accordingly, for the Hall Griffin Defendants, the First Amended Counterclaim filed on November 8, 2019, in each respective case is the current live counterclaim. *See* Lead Case, ECF Nos. 170–71, 173–76, 178–81, 183.

Kubasta PC (referred to here as the "FBFK Defendants").[10] In their respective cases, the FBFK Defendants assert counterclaims seeking a declaratory judgment that no enforceable contract exists, and bringing three claims for recission of guaranty based on fraud (pursuant to Cal. Civ. Code § 1689(b)(1)), failure of consideration (Cal. Civ. Code § 1689(b)(2)–(4)), and as being contrary to the public interest (Cal. Civ. Code § 1689(b)(6)). *See, e.g.*, *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 54 at 31–37.

The Hall Griffin and FBFK Defendants (collectively, "Movants") filed motions for summary judgment. The Hall Griffin Defendants each seek summary judgment on Balboa's claim for breach of guaranty, and on their first and second counterclaims, seeking rescission of guaranty based upon fraud and rescission of guaranty based upon failure of consideration. *See, e.g.*, Lead Case, ECF No. 415. The FBFK Defendants each seek summary judgment on Balboa's claims for breach of contract and breach of guaranty, on the grounds that no enforceable agreement exists between Balboa and defendants. *E.g.*, *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61.

On March 9, 2022, the Court heard argument on the Motions for Summary Judgment. Movants objected to and moved to strike certain paragraphs of and exhibits to the declarations of Patrick Byrne and Robert Rasmussen submitted in support of Balboa's Responses to the Motions for Summary Judgment; the Court has separately sustained those objections and granted the motions to strike. *See* Lead Case, ECF No. 699.

---

[10] *See Siddiqui Transitions*, Case No. 3:18-cv-908; *Las Vegas Transitions*, Case No. 3:18-cv-910; *El-Salibi Transitions*, Case No. 3:18-cv-916; *Wahab Transitions*, Case No. 3:18-cv-1949; *Saghir Transitions*, Case No. 3:18-cv-1950. The FBFK Defendants designated the filings in *Wahab Transitions*, Case No. 3:18-cv-1949, as representative of the motions, briefs, and appendices filed on behalf of all the FBFK Defendants. *See* Lead Case, ECF No. 695.

9

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*., 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the summary judgment movant has met its burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Id.* However, the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

## III. ANALYSIS

It is undisputed that the contracts at issue in this case, the MPA and IPA loan agreements, and associated guaranties, are governed by California law. In California, the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance

or excuse for nonperformance, (3) the defendant's breach and (4) resulting damages to the plaintiff. *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). California courts treat a breach of guaranty cause of action like a breach of contract claim. *Gerristen v. Warner Bros. Entm't, Inc.*, 112 F. Supp. 3d 1011, 1035 (C.D. Cal. 2015).

At the hearing, Balboa conceded that, under California law, a guaranty's obligation is commensurate with that of the principal, and accordingly, the enforceability of the guaranties depends on the enforceability of the MPA and IPAs. *See* Cal. Civ. Code §§ 2809–10. As a result, a decision that the MPA and IPAs are unenforceable will be dispositive of the motions seeking summary judgment as to Balboa's breach of contract and breach of guaranty claims, and any counterclaims seeking rescission of the guaranty agreements.

The Court concludes the Hall Griffin Defendants are entitled to summary judgment on Balboa's breach of guaranty claim, and the FBFK Defendants are entitled to summary judgment on Balboa's breach of contract and breach of guaranty claims. Specifically, summary judgment is warranted because no enforceable contract exists between Balboa and any of the Physician LLCs because mutual assent is lacking on two grounds. First, the MPA and IPA both lack essential contract terms, and second, the MPA and IPA do not reflect an agreement for Balboa to make a lump sum payment of the loan amount to MHT.[11] Each of these will be discussed in turn.

---

[11] For purposes of its earlier analysis of Balboa's Motions for Summary Judgment, the Court previously assumed, without deciding, that the MPA and IPA agreements are not unenforceable for lack of mutual assent, consideration, or essential terms under California law, and denied summary judgment for Balboa on the grounds that there are fact issues as to whether the defendant physicians were fraudulently induced into signing the MPA and IPA agreements, rendering them unenforceable. *See* Lead Case, ECF No. 700 at 11. The Court now revisits that prior assumption, and holds that the MPA and IPA agreements are unenforceable for lack of essential terms and mutual assent.

### a. There is no mutual assent to contract because the MPA and IPA lack essential terms required under California law.

Movants are entitled to summary judgment on the grounds that the MPA and IPA are unenforceable contracts because they are missing essential terms required under California law. Under California law, the existence of a contract requires "[p]arties capable of contracting; [t]heir consent; [a] lawful object; and [a] sufficient cause or consideration." Cal. Civ. Code § 1550. Consent must be free, mutual, and communicated by each to the other. *Id.* § 1565. "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." *Id.* § 1580. Consent is assessed under an objective standard. *Pac. Corp. Grp. Holdings, LLC v. Keck*, 232 Cal. App. 4th 294, 309 (2014).

California law requires certain terms to be in a contract to be enforceable, including the amount of the loan and the rate of interest. *E.g.*, *Setareh v. Elyaszadeh*, 2020 WL 3467840, at *5 (Cal. Ct. App. June 25, 2020) ("The essential terms of a loan include, at a minimum, the parties, loan amount, interest rate, and repayment terms."); *Reeder v. Specialized Loan Servicing LLC*, 52 Cal. App. 5th 795, 803 (2020) (alleged contract lacked loan amount, interest rate, and amortization schedule, and accordingly "the intention of the parties cannot be ascertained and the alleged contract is unenforceable"); *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 60 (Ct. App. 1988) (identifying "essential terms of [a] . . . loan agreement" as including "the amount of the loan, the rate of interest, the terms of repayment, applicable loan fees and charges"). Consent is assessed under an objective standard. *Pac. Corp. Grp. Holdings, LLC v. Keck*, 232 Cal. App. 4th 294, 309 (2014) ("Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, *i.e.*, the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.").

Here, it is undisputed that the contracts at issue, the executed MPA and IPA agreements, do not have an interest rate or loan amount. As described previously, the agreements do not disclose the amount that Balboa is extending to MHT to cover the cost of financing the licenses, but instead, only identifies the repayment to be made, *i.e.*, an unknown loan amount plus interest accrued at an unspecified rate. Balboa's counsel acknowledged at the hearing that the amount Balboa paid to MHT on behalf of a Physician LLC to finance the cost of the licenses was less than the amount to be repaid to Balboa, but that loan amount is not provided on the face of the MPA or IPA, nor is the interest rate that Balboa is using to calculate the repayment amount.

For example, based on the repayment terms recited in the MPA in the Lead Case—"6 Monthly Payments @ $396.00" and "60 Monthly Payments @ $7,596.00,"—the total repayment amount by the Physician LLC, Okoji Home Visits MHT, LLC, is calculated to be $458,136.00. *See* Lead Case, ECF No. 266-1 at 1. However, the Third Amended Complaint filed in the Lead Case alleges that, pursuant to the MPA executed in that case, Balboa loaned the principal sum of $306,000.00 to Okoji Home Visits MHT, LLC, to finance the purchase of four MHT licenses. Lead Case, ECF No. 266 ¶ 22. That $306,000 loan amount is not reflected on the face of the executed MPA. Nor does the MPA recite an interest rate, from which the original loan amount could be back-calculated from the repayment amount. Instead, with only the repayment terms, neither the loan amount nor the interest rate can be determined from the face of the MPA. The IPA similarly fails to recite the loan amount or interest rate being charged.

The lack of a loan amount and interest rate in the executed MPA and IPA means there was no mutual assent or consent to contract, and as a result, the executed MPA and IPA agreements are not enforceable contracts. There is no objective evidence establishing a manifestation of assent to the "same thing" by the parties to each respective MPA or IPA, *i.e.*,

nothing indicating that the parties agreed to the same total loan amount, interest rate, or even the number of licenses or the equipment being financed. For instance, although the repayment amount is disclosed, it is impossible to determine from the face of the agreements whether the parties agreed to a small loan amount and high interest rate, or a larger loan amount and a more modest interest rate. Similarly, it likewise is impossible to determine how many licenses are being financed by the loan, or the cost per license.[12]

Balboa points to no evidence showing mutual assent between the parties to each respective MPA and IPAs.[13] The verbal verification calls conducted by Jonas prior to funding do not establish a meeting of the minds; as discussed, Jonas testified during her deposition that she could not remember specifically making the calls, and only generally recalled having to verify customer billing information and address, and she was never required to discuss the total amount borrowed by each physician. She also was never required to obtain permission from the

---

[12] Some physicians testified that, when the agreement was signed, they had no understanding how many licenses would be purchased. *E.g.*, Lead Case, ECF No. 417 at 52–53 (deposition of Godswill Okoji) ("Q. Did you still have an understanding that you were going to be purchasing four licenses in November of 2016. A. At the discussion, they didn't tell me how many. They said they will review that and let me know how many licenses. . . . [S]o I didn't know how many they were going to purchase. It was essentially their decision, not mine."). For the FBFK Defendants, who are all located in Nevada, the lack of specificity as to the number of the licenses being financed is particularly indicative of a lack of agreement and mutual assent to contract. Each MHT license corresponded to MHT's provision of operational support, software, and equipment to support a single nurse practitioner making house calls in the physicians' region, who could be supervised remotely by the participating physician. Thus, a Physician LLC who agreed to pay for four MHT licenses would correspond to that physician potentially supervising four nurse practitioners. However, Nevada law prohibits physicians from supervising four nurse practitioners; specifically, Nevada Admin Code § 630.495 provides that Nevada physicians may supervise a maximum of three "advance practice registered nurses." Despite this limitation, Balboa maintains that all of the MPA and IPA agreements executed on behalf of physicians practicing in Nevada are for four licenses, *i.e.* four nurse practitioners. In addition, four of the five FBFK Defendants (all except the defendant in *Saghir Transitions*, Case No. 3:18-cv-1950) testified that they knew before entering any agreement that they could only supervise up to three nurse practitioners. *See, e.g.*, *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61-2 at 375 ("Q. Okay. Was there any discussion with MHT in any of the phone calls or dinner meetings or anything like that of having multiple licenses or multiple nurse practitioners at a given time? A. They mentioned that you could, but I always told them back -- that I can't. In the state of Nevada . . . we cannot do more than three and I already had two.").

[13] On the contrary, the record contains evidence tending to show that at least some physicians did not intend to enter into the MPA or IPA agreements. For example, the physician in *Wahab Transitions* testified during her deposition that she did not believe that she was applying for or agreeing to a loan, never signed any agreements, and testified that she first saw the MPA after Balboa contacted her asking for delinquent payments. *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61-2 at 371, 376, 389, 392.

physicians to pay any specific dollar amount to MHT, or to confirm that the physicians had executed a license agreement with or received any equipment from MHT. Moreover, the forms completed by Jonas to document the verbal verification forms are largely incomplete,[14] and do not reference or describe the number of MHT licenses, the equipment being financed, the amount of the loan, the interest rate, or any authorization to disburse a sum certain. *E.g.*, *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61-2 at 566–67. Moreover, some physicians dispute that the verbal verification even occurred.[15]

In addition, Balboa cannot rely on Exhibit A1, purportedly incorporated by reference into the MPA and IPA agreements, to supply the missing loan terms and show mutual assent. There is no document marked as Exhibit A1 in the record, and no competent summary judgment evidence to support Balboa's position that MHT invoices to the Physician LLCs disclosing the number of licenses being financed and cost per license were attached to the MPA and IPA agreements as "Exhibit A1."[16]

Regardless, Balboa argues that, per the language of the MPA and IPA agreements, Exhibit A1 is incorporated by reference into the agreement, and thus the Debtors, *i.e.*, the Physician LLCs, are charged with its contents. *See Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44, 54 (1997) ("A contract may validly include the provisions of a document not physically a part of the basic contract."). "For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the

---

[14] Specifically, the forms contain questions regarding equipment, whether it has it been delivered, installed, and paid for, and whether it is operational. *E.g.*, *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61-2 at 566–67. None of the forms contain responses to these questions. *See, e.g.*, *id.* at 560–83.

[15] *See, e.g.*, *Wahab Transitions*, Case No. 3:18-cv-1949, ECF No. 61-2 at APP268 (deposition of Fadi El-Salibi) ("Q. Do you ever recall speaking with somebody at Balboa named Janet Jonas? A. No."); *id.* at 272 (testifying that Balboa "never" called him).

[16] The only evidence connecting the MHT invoices that Balboa relies on as being "Exhibit A-1" are the declarations of Patrick Byrne or Robert Rasmussen (depending on the case), which the Court previously struck. *See* Lead Case, ECF No. 699.

reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Id.*

Balboa's incorporation-by-reference argument fails for two reasons. First, the MPA and IPA both provide that Exhibit A1 is incorporated for a limited purpose, namely a "description of Equipment and Supplier."[17] To the extent the contracting parties consented to the incorporation of another document into the MPA and IPA, that consent is limited only to incorporation for that specific purpose, and not necessarily for disclosure of essential terms such as loan amount and interest rate. Second, Exhibit A1 is neither known nor easily available to the contracting parties; as discussed, there is no competent summary judgment evidence identifying *any* document in the record as Exhibit A1, let alone that Exhibit A1 was provided to physicians in conjunction with the execution of the MPA and IPA agreements.[18] Moreover, to the extent Exhibit A1 exists, its contents are unknown to the Court. The Court declines to charge the signatories to the MPA and IPA agreements with knowledge of the loan amount and interest rate allegedly contained in an "Exhibit A1," when its contents are unknown and undisputedly it was never provided or made available to the physicians.

As a result, the lack of essential loan terms and evidence of mutual consent to contract mean that no contract was formed between Balboa and each respective Physician LLC. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 460 (2021). Absent an enforceable contract,

---

[17] Specifically, the MPA states: "Equipment Supplier and Description: See Exhibit 'A1' Invoices, or Schedules for description of Equipment and Supplier ('Equipment')." The IPA states: "SOFTWARD DESCRIPTION: See Exhibit 'A1' Invoices or Schedules for description of Equipment and Supplier."

[18] The evidence indicates the contrary. For example, the physician in the Lead Case testified that he did not see any invoices attached to the MPA when he signed it. Lead Case, ECF No. 417 at 66. Similarly, Sophia Fields, Balboa's Director of Operations, agreed that an invoice would not have been attached to an executed MPA as "Exhibit A1" when it was sent to debtors as part of the complete loan documents in a "welcome package," because "[i]t's not a document that is executed by the customer" and "welcome packages are all executed documents from the customer." *Wahab Transitions*, ECF No. 61-2 at APP073–74.

16

there can be no breach, and accordingly, summary judgment is warranted for Movants on Balboa's breach of contract claim and, by extension, breach of guaranty claim.[19]

### b. There is no mutual assent for Balboa to make a lump-sum payment of the entire loan amount.

Summary judgment is further appropriate on the grounds that there was no mutual assent between the parties for Balboa to make a lump-sum payment of the entire loan amount to MHT at the inception of the loan. Thus, even assuming that the executed MPA and IPA agreements disclosed the essential loan terms necessary to make them enforceable—which, as discussed, they do not—there is no basis for Balboa to hold the Physician LLCs and guarantors liable for the entire loan amount.

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ. Code § 1639. As discussed, neither the MPA nor the IPA expressly authorized Balboa to make a lump-sum payment of the entire loan amount to MHT at the inception of the loan. Instead, the MPA states "You [Debtor] request that we pay Supplier and you acknowledge that *monthly payments* will commence." MPA at 1 (emphasis added). Similarly, the IPA describes how the parties agreed for Balboa to effectively step into the shoes of the Physician LLC in making payments to MHT, namely that "instead of Debtor making payments of the Fee to vendor(s), Creditor shall instead make such *payments* of the Fee on behalf of Debtor to vendor(s) under the Software Documents." IPA at 1 (emphasis added). Nothing in the MPA or the IPA contemplates that the contracting parties agreed for Balboa to

---

[19] This result is warranted even though Balboa funded each respective "loan" by sending a payment to MHT. "The failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties . . . have taken some action related to the contract." *Bustamante v. Intuit, Inc*., 141 Cal. App. 4th 199, 215 (2006).

forward the entire loan amount to MHT at the inception of the loan.[20] On the contrary, the language contemplates Balboa acting in lieu of Debtor in making multiple payments under the relevant license or software agreement.

This interpretation is further confirmed by the MHT software and license agreements that were supposed to have been executed between MHT and each Physician LLC. During discovery, Balboa produced MHT contracts—a Management Services Agreement ("MSA") and License Agreement—to govern the relationship between MHT and the Physician LLC; the MSA covers MHT's provision of operational support, software, and equipment to each Physician LLC, and the License Agreement provides for the licensing of proprietary software. *See, e.g.*, Lead Case, ECF No. 417 at APP205–34. The License Agreement describes how the "Medical Home Practice"—*i.e.*, the Physician LLC—shall pay MHT six consecutive payments of $99.00 followed by consecutive monthly payments of $1,899.00. *Id.* at 208; *see also Wahab Transitions*, Case No. 3:19-cv-1949, ECF No. 61-2 at APP032 (testimony of Balboa's CEO, Patrick Byrne, agreeing that the License Agreement provides for "monthly installments" and does not provide for a lump-sum payment). Moreover, the License Agreement and MSA both provide for early termination by both MHT and the Physician LLC. *See* Lead Case, ECF No. 417 at APP210–11, 228; *see also Wahab Transitions*, Case No. 3:19-cv-1949, ECF No. 61-2 at APP032. The MSA provides that, in the event of Termination, no party has any further obligation except, *inter alia*, "payment of any outstanding Management Fees due but unpaid." *See* Lead Case, ECF No. 417 at APP228.

---

[20] Indeed, the summary judgment record indicates that at least one physician understood that the licenses would be funded as nurse practitioners were hired, as opposed to all licenses being funded in a lump-sum payment upfront. *E.g.*, *Wahab Transitions*, ECF No. 3:18-cv-1949, ECF No. 61-2 at APP178 (testimony of Sushil Patel) ("My understanding was that we would – eventually once they provided a nurse practitioner, we would start with one entity at a time, and so, if anything, it would be one license, I guess, at a time. So I didn't know what the cost of that one license would be, but I didn't think it would be all four licenses activated all at once, and if we even go up to four licenses.").

In sum, the MPA and IPA indicate that, Balboa would make monthly payments to MHT on behalf of Debtor, pursuant to a license agreement or "Software Documents" between MHT and Debtor. Those documents—the MSA and License Agreement—likewise provide for monthly payments between MHT and the Physician LLC, indicating that the license agreement was a perpetual, installment-based license, as opposed to a lump-sum, upfront payment. Thus, nothing in the loan documents authorized Balboa to make a lump-sum payment for the entire loan amount at inception. Moreover, it is undisputed that no License Agreement or MSA was ever executed by any physician or Physician LLC, and that Balboa funded each loan without confirming that there was any agreement between MHT and a Physician LLC. *See* Lead Case, ECF No. 417, at APP008–9. Given these undisputed facts, the Court finds that Balboa's lump-sum payments to MHT in each of the respective cases was gratuitous, and not pursuant to any contract or agreement between Balboa and the Physician LLCs. Accordingly, the Court grants summary judgment to Movants on Balboa's breach of contract and breach of guaranty claims.

**IV.   CONCLUSION**

For the foregoing reasons, the Court concludes that there is no enforceable contract between Balboa and each respective Physician LLC, and that each associated guaranty is null and void. The Court thus **GRANTS** summary judgment for the FBFK Defendants on Balboa's breach of contract and breach of guaranty claims, and **GRANTS** summary judgment for the Hall Griffin Defendants on Balboa's claims for breach of guaranty. In addition, because their liability would depend on the existence of a contract that the Court has determined does not exist, the Court sua sponte **GRANTS** summary judgment for the Physician LLCs on Balboa's breach of contract claim in the cases involving the Hall Griffin Defendants. The Court denies the

remainder of Movants' requests for summary judgment on their respective counterclaims as moot.

Judgment in each respective case will be entered separately. Any motion seeking attorneys' fees shall be filed by **March 15, 2023.**

**SO ORDERED**.

March 3, 2023.

_____
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE